UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| CLOCKWORK HOME SERVICES, INC., | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 4:05CV1422 JCH |
| | ) | |
| MICHAEL ROBINSON, | ) | |
| | ) | |
| Defendant(s). | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant Michael Robinson's Motion to Dismiss for Lack

of Personal Jurisdiction and Failure to State a Claim, filed October 28, 2005. (Doc. No. 3). The

matter is fully briefed and ready for disposition.

## BACKGROUND

By way of background[1], on January 4, 2002, Venvest of Florida, L.L.C., caused BuyMax

LLC ("BuyMax") to be organized as a limited liability company under the laws of the state of

Missouri. (Compl., ¶ 5). Venvest later changed its name to Clockwork Home Services, Inc.

("Clockwork"), and is referred to hereinafter as "Clockwork". (Id.). Clockwork was the sole

member of BuyMax. (Id.). BuyMax was formed for the purpose, among others, of owning and

operating a buying organization specializing in the purchase and sale of heating, ventilating, air-

conditioning and plumbing goods, equipment, and accessories. (Id.).

On or about January 28, 2000, Defendant Michael Robinson ("Robinson") was hired to be

an employee-at-will of an affiliate of Clockwork, and in that capacity, executed a "Confidentiality,

---

[1] The majority of the Court's background section is taken from Plaintiff's Complaint, to which
Defendant has not yet filed an Answer.

Noncompetition, and Nonsolicitation Agreement" with Clockwork (the "Confidentiality Agreement"). (Compl., ¶ 6). The Confidentiality Agreement provided that, "any legal suit, action or proceeding arising out of or relating to this Agreement shall be commenced in a state or federal court located in Missouri, and [Robinson] irrevocably submit[s] to the jurisdiction and venue of such court in any such suit, action or proceeding..." (Id., ¶ 7, quoting Plaintiff's Exh. 1, P. 4).

On or about January 1, 2003, Robinson entered into a Subscription Agreement with BuyMax, to purchase a 12.5% membership interest in BuyMax. (Compl., ¶ 8). That same day, Clockwork and Robinson entered into an Amended and Restated Operating Agreement of BuyMax, LLC ("Operating Agreement"). (Id., ¶ 9). Further, Clockwork, BuyMax and Robinson entered into an Owners Agreement in which, among other things, Robinson was appointed President of BuyMax, and designated an employee-at-will of BuyMax. (Id., ¶ 10). Finally, on February 27, 2003, Clockwork and Robinson entered into a Memorandum of Understanding, that amended some of the terms and conditions of the Owners Agreement and Operating Agreement. (Id., ¶ 11).

On March 1, 2005, Robinson, purportedly acting in his capacity as President of BuyMax, entered into an Authorized Reseller Agreement ("Reseller Agreement") with Megola, Inc. ("Megola"). (Compl., ¶ 12). The Reseller Agreement, among other things, purported to obligate BuyMax to be the "sole and exclusive reseller" of Megola's products within the United States for a period of three years. (Id., ¶ 13).

According to Clockwork, Robinson may have engaged in one or more serious violations of the policies and practices of Clockwork and/or BuyMax, relating to Robinson's negotiation and execution of the Reseller Agreement on behalf of BuyMax. (Compl., ¶ 17). Specifically, Clockwork alleges that during an August 26, 2005, meeting, Robinson admitted or did not contest that on or about February 1, 2005, he entered into an agreement with Megola to purchase 100,000 shares of

Megola common stock. (Id., ¶ 18). Clockwork alleges Robinson further admitted or failed to contest that he purchased additional shares of Megola common stock either before or after the February 1, 2005, purchase, and that he did not advise Clockwork of the stock purchases prior to the August 26 meeting. (Id., ¶¶ 19, 20). As a result, on August 26, 2005, Clockwork caused BuyMax to suspend Robinson's at-will employment as President and as an employee, with pay and benefits, pending an investigation. (Id., ¶ 21).

On or about August 29, 2005, Mr. Christopher Harris, counsel for Robinson, sent a letter to Clockwork, asserting as follows:

a. that Robinson was unaware of any agreements or policies violated by Robinson;

b. that Robinson had a twenty-five percent membership interest in BuyMax; and

c. that Clockwork's actions in suspending Robinson pending investigation "deliver a message to third parties that is damaging....to Mr. Robinson personally."

(Compl., ¶ 22, citing Plaintiff's Exh. 7). On September 7, 2005, Mr. Robert F. Beckmann, Chief Legal Officer for Clockwork, sent a letter to Mr. Gregory S. Reynolds, stating in relevant part as follows:

Based on our previous telephone conversation, it is our understanding that you represent Michael Robinson....

Given the fact that [Clockwork] clearly intended to give Mr. Robinson the opportunity to respond to the results of its investigation, [Clockwork] viewed Mr. Robinson's hiring of "litigation counsel" prior to the completion of its investigation as an indication that he was contemplating immediately filing litigation against [Clockwork]. Accordingly, [Clockwork] retained its own legal counsel who recommended the filing of a lawsuit, a courtesy copy of which is attached for your information....

(Reply Memorandum of Law in Further Support of Defendant's Motion to Dismiss ("Robinson's Reply"), attached Exh. 1). Clockwork's attorney continued to state that based on the facts and

circumstances discovered during its investigation, Clockwork, as majority member of BuyMax, was terminating Robinson's at-will employment and removing him as President of BuyMax. (Id.).[2]

As indicated in Mr. Beckmann's letter, Clockwork filed the instant Complaint on September 6, 2005. (Doc. No. 1). In its Complaint, Clockwork requests Declaratory Judgment regarding Robinson's Agreements with and Duties to Clockwork (Count I), and Declaratory Judgment as to Reseller Agreement and Other Agreements with Megola (Count II). Clockwork further alleges Robinson is liable for Breach of Fiduciary Duty (Count III), and Fraudulent Concealment (Count IV). On October 4, 2005, Robinson filed his own suit against both Clockwork and BuyMax in Tennessee state court, asserting numerous claims including breach of contract and breach of fiduciary duty. (Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss ("Clockwork's Memo in Opp."), attached Exh. C).

As stated above, Robinson filed the instant Motion to Dismiss on October 28, 2005. (Doc. No. 3). In his motion, Robinson first asserts this Court lacks personal jurisdiction over him. Robinson continues to assert that Clockwork has no standing to maintain its claims for breach of fiduciary duty, fraudulent concealment, and declaratory relief, as the injuries for which Clockwork seeks relief were suffered by its subsidiary, BuyMax, rather than Clockwork. Finally, Robinson asserts that even assuming Clockwork has standing to bring its claims, they still fail as a matter of law.

## DISCUSSION

## I. Personal Jurisdiction

---

[2] In its Complaint, Clockwork alleges the results of its investigation revealed that Robinson's entering into both the Reseller Agreement and additional agreements with Megola had no legitimate business justification, and was damaging to BuyMax and Clockwork. (Compl., ¶ 23).

In his Motion to Dismiss, Robinson first contests whether this Court properly may exercise personal jurisdiction over him. In the context of a motion to dismiss, this Court has held as follows:

> The party invoking jurisdiction of a federal court bears the burden to show that jurisdiction exists. To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff is only required to make a prima facie showing of personal jurisdiction over the defendant. If the district court relies on pleadings and affidavits, the court must look at the facts in the light most favorable to the party invoking personal jurisdiction, and resolve all factual conflicts in favor of that party.

Anheuser-Busch, Inc. v. City Merchandise, 176 F.Supp.2d 951, 955 (E.D. Mo. 2001) (internal citations omitted).

A federal court engages in a two-step inquiry to determine whether it may exercise jurisdiction over a non-resident defendant. First, the court must determine whether the defendant committed one of the acts enumerated in the state long-arm statute. Angelica Corp. v. Gallery Mfg. Corp., 904 F.Supp. 993, 996 (E.D.Mo. 1995) (citations omitted). If so, then the court must determine, "whether the exercise of personal jurisdiction over [the] defendant comports with the Due Process Clause of the Fourteenth Amendment." Id. (citations omitted).

The Eighth Circuit has held that, "[n]onresidents are subject to personal jurisdiction to the extent that state law allows." Dominium Austin Partners, L.L.C. v. Emerson, 248 F.3d 720, 726 (8th Cir. 2001) (citation omitted). "Missouri liberally construes the provisions of its long-arm statute in order to exercise its jurisdiction to the fullest extent permitted by the Due Process Clause, within the specific categories enumerated in the statute." City Merchandise, 176 F.Supp.2d at 955 (internal quotations and citations omitted); see also Institutional Food Marketing Assoc., Ltd. v. Golden State Strawberries, Inc., 747 F.2d 448, 453 (8th Cir. 1984); Peabody Holding Co., Inc. v. Costain Group PLC, 808 F. Supp. 1425, 1432 (E.D. Mo. 1992) (internal quotations and citation omitted) ("The legislature, in enacting this statute, sought to extend the jurisdiction of Missouri courts to numerous

classes of out-of-state defendants who could not have been sued in Missouri under the preexisting law."). "As such, 'the examination of whether Missouri's long-arm statute has been satisfied is coextensive with whether the assertion of personal jurisdiction over the defendant meets the requirements of due process, and the analysis is collapsed into the single question of whether asserting jurisdiction violates the Due Process Clause.'" Meredith, Inc. v. The Marketing Resources Group of Oregon, Inc., 2005 WL 2334294 at * 2 (E.D. Mo. Sep. 23, 2005), quoting Bell v. Imperial Palace Hotel/Casino, Inc., 200 F.Supp.2d 1082, 1085 (W.D. Mo. 2001).

In analyzing whether a party's contacts with the forum comport with the dictates of constitutional due process, the Eighth Circuit has held as follows:

> In a series of cases following *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), the Supreme Court has elucidated the "minimum contacts" standard that must be satisfied before a nonresident can be subjected to the jurisdiction of a state's courts. Due process requires that out-of-state defendants have fair warning that they could be haled into court in a foreign jurisdiction. This requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum…and the litigation results from alleged injuries that arise out of or relate to those activities.

> The contacts with the forum state must be more than random, fortuitous, or attenuated. The due process clause forecloses personal jurisdiction unless the actions of the defendant himself....create[d] a substantial connection with the forum State. Once the court has found that the defendant purposefully established the requisite minimum contacts with the forum state, the court still must determine whether the assertion of jurisdiction comports with fair play and substantial justice.

Dakota Industries, Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1389 (8th Cir. 1991) (internal quotations and citations omitted).

In this circuit, the due process standard has been expressed as a consideration of five factors: "1) the nature and quality of contacts with the forum state, 2) the quantity of such contacts, 3) the relation of the cause of action to the contacts, 4) the interest of the forum state in providing a forum for its residents, and 5) the convenience of the parties." Anheuser-Busch, Inc. v. All Sports Arena

Amusement, 244 F.Supp.2d 1015, 1020 (E.D. Mo. 2002) (citation omitted).  See also BIB Mfg. Co. v. Dover Mfg. Co., 804 F.Supp. 1129, 1132 (E.D. Mo. 1992).  The first three factors are primary considerations, while the latter two are secondary.  Aylward v. Fleet Bank, 122 F.3d 616, 618 (8th Cir. 1997).

In the instant case, the Court finds the nature, quality, and quantity of Robinson's contacts with the forum state were significant.  For example, as noted above Robinson was both a Member and President of BuyMax, a Missouri limited liability company.  (Compl., ¶¶ 5, 8, 10).  The Operating Agreement pursuant to which Robinson became a Member was to be governed by Missouri law, and any disputes arising thereunder were to be arbitrated in St. Louis, Missouri.  (Compl., attached Exh. 3, P. 22).[3]  The Owners Agreement pursuant to which Robinson became President was entered into in Missouri, and was to be construed pursuant to Missouri law.  (Compl., attached Exh. 4, PP. 1, 4). Furthermore, Robinson made multiple trips to Missouri to transact business on behalf of BuyMax, and regularly communicated via e-mail, telephone, and mail, with Clockwork's employees in its Missouri office.  (Clockwork's Memo in Opp., P. 5, citing Myers Aff., ¶¶ 12-14, 18-20).

Finally, the Court notes that the Confidentiality Agreement between the parties, entered into on December 28, 2000, contained a forum selection clause indicating Robinson's consent to suit in Missouri.  (Compl., attached Exh. 1, P. 4).  The parties dispute whether the Confidentiality Agreement remains in existence, and if so, whether it encompasses the instant claims.  The parties have not presented sufficient evidence for the Court to determine those issues at this time, "and at this early stage of the litigation, the Court must not consider the merits of a particular claim."  All

---

[3] Thus, an Agreement at the heart of the current dispute had significant connections with Missouri.  (See Compl., attached Exh. 3, PP. 9, 21).

Sports Arena Amusement, 244 F.Supp.2d at 1019. This does not render the existence of the forum selection clause unimportant, however:

> Regardless of whether the [confidentiality] agreement applies here, the forum selection clause is prima facie evidence that the defendant was aware of the plaintiff's desire to have all litigation arising out of the relationship between the parties heard in Missouri courts....This court will not definitively rule that the forum selection clause covers the [] dispute between the parties, but finds that the existence of the clause is at least a factor to be considered in weighing the extent of the defendant's contacts with the forum for purposes of determining jurisdiction. The existence of the forum selection clause lends support for the finding that the defendant should have reasonably anticipated being haled into court in Missouri.

Id. at 1019-20 (citation omitted).

Upon consideration of the foregoing the Court finds that, viewing the allegations in the light most favorable to Clockwork, the nature, quality and quantity of Robinson's contacts with Missouri were both strong and beneficial to Robinson. Further, with respect to the relation of the cause of action to Robinson's contacts with the forum state, as noted above, Robinson's contacts with the forum state include entering into one of the Agreements at issue, the Owner's Agreement, in Missouri. (See Compl., ¶¶ 28, 29, 34, 44, 45, 49). The relevant contacts thus directly gave rise, at least in part, to the instant cause of action.

With respect to the secondary considerations, Missouri's interest is not as strong in providing a forum for Clockwork, a non-resident. Further, the Court recognizes it may be more convenient for Robinson to litigate this claim outside of Missouri. Upon consideration, however, it does not appear to violate Robinson's due process rights to subject him to the jurisdiction of the forum state under whose laws the company for whom he served as Member and President was organized. See Angelica, 904 F.Supp. at 997-98 ("However, there is no showing that any inconvenience to the defendant

outweighs the other factors which cut in favor of specific personal jurisdiction in this case."). Robinson's Motion to Dismiss for Lack of Personal Jurisdiction will therefore be denied.[4]

## II.  <u>Standing</u>

In his next argument in favor of dismissal, Robinson asserts Clockwork lacks standing to bring its claims for breach of fiduciary duty and fraudulent concealment.  (Defendant's Memorandum of Law in Support of his Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim ("Robinson's Memo in Support"), PP. 9-10).[5]  Specifically, Robinson asserts that because the alleged injuries were to BuyMax and its shareholders as a whole, "the right to maintain the suit is a right of the corporation and must be brought derivatively."  (Id., P. 9, citing <u>Dawson v. Dawson</u>, 645 S.W.2d 120, 125 (Mo. App. 1982)).[6]

The Eighth Circuit has held that, "[t]he general rule in Missouri is that, in breach of fiduciary duty suits, individual shareholders must sue corporate directors and officers derivatively."  <u>Gray v. Bicknell</u>, 86 F.3d 1472, 1487 (8th Cir. 1996) (citation omitted).  This is because the injury flowing from such a breach is to the corporation, i.e., to the shareholders collectively, and not to the shareholders individually.  <u>Dawson</u>, 645 S.W.2d at 125.  An exception to this general rule exists, however, permitting an individual rather than derivative action, "[w]here a complaint relates to the direct injury of the plaintiff,..."  <u>Id.</u>; <u>see also</u> <u>Arent v. Distribution Sciences, Inc.</u>, 975 F.2d 1370, 1374

---

[4] In light of the Court's ruling finding specific jurisdiction, it need not consider whether it possesses general jurisdiction over Defendant Robinson.

[5] The Court finds this argument encompasses Count II, as well as Counts III and IV, as Count II appears to be a claim for Declaratory Judgment based on Robinson's alleged breach of fiduciary duty and fraudulent concealment.

[6] Clockwork does not dispute Robinson's contention that the same holds true for members of a limited liability company who, like shareholders of a corporation, are provided a mechanism under the Missouri Limited Liability Company Act for bringing derivative suits on behalf of the company.  (Robinson's Memo in Support, P. 9, citing Mo. Rev. Code § 347.171 (2005)).

(8th Cir. 1992) (citation omitted) ("Whether a suit may be brought as an individual action or only as a derivative suit on behalf of the corporation turns on whether the plaintiff has suffered an injury distinct from that incurred by the corporation."). Thus, the difficult part of the analysis lies in characterizing the injury claims. <u>Gray</u>, 86 F.3d at 1487.

"In determining whether or not an injury is direct as to the individual or indirect as to the corporation, a court must look to the body of the complaint and the gravamen of the injuries asserted." <u>Gill v. Three Dimension Systems, Inc.</u>, 87 F.Supp.2d 1278, 1286 (M.D. Fla. 2000) (citation omitted). "If the damages at issue are only indirectly sustained by the stockholder as a result of injury to the corporation, the stockholder does not have a cause of action as an individual." <u>Id.</u> (citation omitted).

In the instant case, Clockwork asserts that by entering into the Reseller and other agreements with Megola, Robinson harmed Clockwork in the following ways:

23a. Although the price per unit of Megola's product is the same as a competitive product previously sold by BuyMax, BuyMax must pay Megola an additional $20 per unit for warranty coverage that was not required with the competitive product previously sold by BuyMax;

b. Megola's product, unlike the competitive product previously sold by BuyMax, is not approved by Underwriter's Laboratory (UL) even though Megola's product is designed to be installed in residences, homes and apartments;

c. Megola's product, unlike the competitive product previously sold by BuyMax, is not well known among BuyMax's customers;

d. There were serious delays in obtaining the initial order of product from Megola forcing BuyMax to continue to stock and sell the competitive product previously sold by BuyMax;

e. Megola reportedly has had and continues to have serious financial, liquidity and cash flow problems as indicated in their public filings with the Securities Exchange Commission. Upon information and belief, such problems were known to Robinson at all material times herein;

f.      In the event that Megola ceases operations, BuyMax's inventory of its Megola products will be worthless;

g.      In the event Megola ceases operations, it is highly likely that any product warranties given by Megola will be worthless.

24.     Clockwork's investigation subsequent to the interim suspension of Robinson also revealed that after the execution of the Reseller Agreement, Robinson attempted to require BuyMax to pay Megola $142,500.00 in advance for an order of 500 units contrary to BuyMax's and Clockwork's established payment policies for new vendors.

25.     Even after Robinson knew or should have known of Megola's financial, liquidity and cash flow problems, and after Robinson knew or should have known of serious delivery problems with Megola regarding the first shipment of product under the Reseller Agreement, Robinson, according to a May 6, 2005 Megola press release, continued to expand BuyMax's commitment to and investment in Megola by "initiating a new product trial with BuyMax, LLC, to introduce Megola's recently acquired ultraviolet (UV) water disinfection systems."

26.     Even after Robinson knew or should have known of Megola's financial, liquidity and cash flow problems, and after Robinson knew or should have known of serious delivery problems with Megola regarding the first shipment of product under the Reseller Agreement, Robinson, according to an August 8, 2005 Megola press release, continued to expand BuyMax's commitment to and investment in Megola by initiating and ordering a new product line from Megola--1,000 indoor air quality units.

(Compl., ¶¶ 23-26).

Upon consideration of the foregoing, the Court finds Clockwork has failed to allege any facts tending to establish it has been harmed individually by Robinson's alleged misconduct; rather, any improprieties on Robinson's part necessarily directly harmed BuyMax, and only indirectly harmed Clockwork in its capacity as a Member.  See Centerre Bank, N.A. v. Angle, 976 S.W.2d 608, 614 (Mo. App. 1998).  In other words, the injuries complained of by Clockwork are the same as those sustained by any other shareholder of BuyMax as a result of Robinson's actions, and thus any action

seeking relief must be brought derivatively.  <u>See</u> <u>Gill</u>, 87 F.Supp.2d at 1286-87.[7]  Robinson's Motion

to Dismiss Counts II, III and IV for lack of standing must therefore be granted.

## III.    <u>Declaratory Judgment</u>

In his final argument in favor of dismissal, Robinson asserts Count I of Clockwork's

Complaint is improper under the Declaratory Judgment Act.  (Robinson's Memo in Support, PP. 12-

15).  As relevant here, Robinson maintains Clockwork's words and actions demonstrate their first

declaratory action claim was filed for the purpose of "procedural fencing"; in other words, it was

intended to deprive Robinson of his choice of forum.  (<u>Id.</u>, P. 13).

"When parallel litigation has been instituted in separate courts, resulting in concurrent

jurisdiction over a dispute, the first court in which jurisdiction attaches has priority to consider the

case."  <u>Schwendiman Partners, LLC v. Hurt</u>, 71 F.Supp.2d 983, 987 (D. Neb. 1999) (internal

quotations and citations omitted).  "This first-filed rule is not intended to be rigid, mechanical, or

inflexible, but is to be applied in a manner best serving the interests of justice."  <u>Northwest Airlines,</u>

<u>Inc. v. American Airlines, Inc.</u>, 989 F.2d 1002, 1005 (8th Cir. 1993) (internal quotations and citation

omitted).  "The prevailing standard is that in the absence of compelling circumstances, the first-filed

---

[7] The requirement of pleading a derivative suit is not altered by the fact that BuyMax has only two shareholders, Clockwork and Robinson, and thus Clockwork was the only injured party. <u>Peterson v. Kennedy</u>, 791 S.W.2d 459, 464 (Mo. App. 1990).

> This rule [requiring derivative suits] is to protect not only other shareholders, but also to protect creditors of the corporation....Derivative suits protect creditor interests because any recovery goes to the corporation, not the shareholders.  Thus, even if all shareholders injured by corporate theft join in one suit, the suit must still be on the behalf of the corporation.

<u>Peterson</u>, 791 S.W.2d at 464 (citations omitted).  <u>See also</u> <u>Bruner v. Workman Oil Co.</u>, 78 S.W.3d 801, 804 (Mo. App. 2002) (citation omitted) ("Even when a court is not aware of corporate creditors, there is no exception to the requirement that an action by a shareholder seeking recovery for a wrong done to the corporation must be brought as a derivative action rather than as an individual action.").

rule should apply." <u>U.S. Fire Ins. Co. v. Goodyear Tire & Rubber Co.</u>, 920 F.2d 487, 488-89 (8th Cir. 1990) (internal quotations and citations omitted).

The Eighth Circuit has identified two "red flags" that may signal the existence of compelling circumstances, as follows: "(1) the first-filed suit was filed after the other party gave notice of its intention to sue; and (2) the first-filed suit is for declaratory judgment, rather than for damages or equitable relief, therefore suggesting a 'race to the courthouse' in an attempt to preempt the natural plaintiff from his or her choice of forum." <u>Schwendiman Partners</u>, 71 F.Supp.2d at 987-88 (citations and footnote omitted). Other factors that may be considered in deciding whether to apply the first-filed rule include the period of time that elapses between the date the first-filer receives notice of a possible lawsuit against it, and the filing of the first-filer's lawsuit; the failure of the first-filer to allege that the natural plaintiff's claims are producing an adverse impact on the first-filer; evidence that the first-filer indicated it would not sue, together with reliance on that indication by the natural plaintiff; and which lawsuit would more effectively further the interest of speedy adjudication. <u>Schwendiman Partners</u>, 71 F.Supp.2d at 988, citing <u>Anheuser-Busch, Inc. v. Supreme Intern. Corp.</u>, 167 F.3d 417, 419 (8th Cir. 1999); <u>Midwest Motor Express, Inc. v. Central States Southeast</u>, 70 F.3d 1014, 1017 (8th Cir. 1995), <u>cert. denied</u>, 517 U.S. 1203, 116 S.Ct. 1704, 134 L.Ed.2d 803 (1996).

Upon consideration, the Court finds that compelling circumstances exist such that the first-filed rule should not apply in this case, and Count I should be dismissed in favor of the litigation filed by Robinson in Tennessee state court. <u>Schwendiman Partners</u>, 71 F.Supp.2d at 988. Specifically, the Court first finds that with its September 7, 2005, letter, Clockwork acknowledges both that it had notice Robinson was contemplating filing suit, and that it retained legal counsel and filed the instant suit as a consequence of such notice. (Robinson's Reply, attached Exh. 1, P. 1). Second, Count I of Clockwork's Complaint, the only remaining count, is for declaratory judgment, rather than for

damages or equitable relief. Third, it appears that one week or less elapsed between the time Clockwork learned Robinson had engaged litigation counsel, and the time Clockwork filed its declaratory judgment action, thus suggesting that Clockwork "raced to the courthouse" in order to usurp Robinson's forum choice. <u>Anheuser-Busch</u>, 167 F.3d at 419, citing <u>BASF Corp. v. Symington</u>, 50 F.3d 555, 557-58 (8th Cir. 1995). Fourth, Clockwork fails to allege in Count I that Robinson's claims are producing an adverse effect. Finally, in light of this Court's dismissal of Counts II through IV of Clockwork's Complaint, the Court finds Robinson's Tennessee lawsuit more effectively furthers the interest of speedy adjudication, as the rights of all interested parties, including BuyMax, may be determined in that forum.[8] The declaratory judgment action set forth in Count I of Clockwork's Complaint will therefore be dismissed, in favor of Robinson's later-filed litigation in Tennessee state court.

<u>**CONCLUSION**</u>

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Michael Robinson's Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim (Doc. No. 3) is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that Robinson's Motion to Dismiss for Lack of Personal Jurisdiction (Doc. No. 3) is **DENIED**.

**IT IS FURTHER ORDERED** that Robinson's Motion to Dismiss for Failure to State a Claim (Doc. No. 3) is **GRANTED**, without prejudice to Clockwork's right to file appropriate

---

[8] The Court finds the above-described compelling circumstances favor the dismissal of this action, despite the inapplicability of the fifth factor.

counterclaims in the litigation initiated by Robinson in Tennessee state court. An appropriate Order of Dismissal shall accompany this Memorandum and Order.

Dated this <u>31st</u> day of March, 2006.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE